NOT DESIGNATED FOR PUBLICATION

**STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT**

**20-134**


**SUCCESSION OF WILLIAM DOUGLAS ELLIOTT**


\*\*\*\*\*\*\*\*\*\*


APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 43775
HONORABLE PATRICIA EVANS KOCH, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**JOHN E. CONERY
JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Sylvia R. Cooks, John E. Conery, and D. Kent Savoie, Judges.


**AFFIRMED.**

**Brian K. Thompson**
**Thompson Law Firm, LLC**
**3600 Jackson Street, Suite 115B**
**Alexandria, Louisiana 71303**
**(318) 473-0052**
**COUNSEL FOR APPELLANT:**
    **Succession of William Douglas Elliott**
    **Carol Ann Elliott Feldkamp**

**Michael H. Davis**
**Law Office of Michael H. Davis**
**2017 MacArthur Drive, Building 4, Suite A**
**Alexandria, Louisiana 71301**
**(318) 445-3621**
**COUNSEL FOR INTERVENORS/APPELLEES:**
    **Eugenia Caroline Willis**
    **Katherine Feldkamp Cunningham**

**Theodore D. Vicknair**
**Vicknair Law Firm, LLC**
**3112 Jackson Street**
**Alexandria, Louisiana 71301**
**COUNSEL FOR INTERVENORS/APPELLEES:**
    **Eugenia Caroline Willis**
    **Katherine Feldkamp Cunningham**

**CONERY, Judge.**

In this proceeding, the parties presented the trial court with the question of whether certain assets were part of the Succession of William Douglas (W.D.) Elliott or whether the assets were maintained within a trust created by Mr. Elliott and his wife, Floy. The administratrix, the couple's only daughter, Carol, contended that all assets belonged to the estate and that she was entitled to be placed in possession as W.D.'s sole heir. Mr. and Mrs. Elliott's granddaughters, Carol's daughters, intervened and contended that the assets were instead property of a trust created by Mr. and Mrs. Elliott. Following an evidentiary hearing, the trial court determined that Mr. and Mrs. Elliott had voluntarily placed the assets in question into the subject trust, and that Mrs. Elliott's removal of the assets from the trust after Mr. Elliott's death did not result in revocation of the trust as urged by Carol. According to the trust, all assets therein were to be divided equally between Carol and her two daughters. Carol, the Succession Administratrix, appeals. For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

The decedents, William Douglas (W.D.) Elliott and his wife, Floy M. Elliott, lived much of their married life in Arkansas. One child, Carol Ann Elliott Feldkamp, was born of the marriage. Carol had two daughters, Eugenia Caroline Feldkamp Willis (Caroline) and Katherine Feldkamp Cunningham (Katherine).

On May 25, 1995, while living in Arkansas, W.D. and Floy created the "Elliott Living Trust." Article One of the documents identified both W.D. and Floy as "Trustmakers,"[1] and as the "Initial Trustees." Either of them, as Initial Trustees,

---

[1] Article One of the Trust equated a "Trustmaker" with a "'Grantor,' 'Settlor,' 'Trustor' or any other word which may refer to the maker of a trust[.]"

were empowered "to act or conduct business on behalf of the other Initial Trustee or the Trust without the specific consent of the other Initial Trustee, as set forth in Article Five."

Article Five, addressing the "Powers of the Initial Trustees," provides that "during [their] lifetime," W.D. and Floy had broad power and authority over the Trust as follows:

I.     TRUST ESTATE

During our lifetime, we shall have the total and complete power to control the Trust Estate and may serve with all of the obligations, powers and authority granted within this Trust Agreement.

We may hold, manage, invest, and reinvest the Trust Estate. We may collect the income therefrom, and may pay to us during our joint lives, all of the net income of the Trust Estate and shall pay to each of us all separate net income from either our respective share of the Trust Estate. We may, also, pay principal, up to the whole thereof, to us as the Trustmakers, upon our demand that such principal payment shall be made. In the event, a Trustmaker, who transferred separate estate property to the Trust, the Trustee shall pay so much of the principal of the separate estate established by such Trustmaker, up to the whole thereof, as either of us shall request.

*We shall have the absolute power and right to add to or remove from the Trust Estate at any time.*

(Emphasis added.)

In addition to the various powers specifically designated in Article Five, the Trust describes the "Powers of Trustee" in Article Twelve, which indicates in pertinent part:

G.     Investment Powers

a.     General

The Trustee has the power to invest and reinvest principal and income, to purchase or acquire therewith every kind of property, real, personal, or mixed, and every kind of investment, specifically including, but not by way of limitation, shares in one or more mutual funds, in any Common Trust Funds administered by the Trustee, corporate

2

obligations of every kind, and stock, preferred or common which persons of prudence and discretion and intelligence acquire for their own account.

The Trustee is further authorized to buy, sell and trade in securities of any nature and for such purposes may maintain and operate accounts with brokers and may pledge any securities held or purchased by it with such brokers as security for loans and advances made to the Trustee.

Funding the Trust, W.B. and Floy transferred their property as evidenced by

Article Four, which provides:

I.     INITIAL TRUST PROPERTY

The Trustmakers acknowledge that we have transferred, assigned and conveyed all of our right, title and interest in and to any and all property that we own which may be permitted to be held as trust property, wherever situated, held or located, whether real or located, whether real or personal, tangible or intangible, separate, joint or community, concurrent with at least $10.00, to be held in Trust by our Initial Trustees, to be held, administered and distributed for our benefit and the benefit of our Beneficiaries set forth herein.

Article 4 further allowed the Elliotts to make "additions" to the Trust as follows:

II.    ADDITIONS TO OUR TRUST ESTATE

Additional property may be added to the Trust Estate at any time by the Trustmakers, together or separately, or by any person or persons, by inter vivos or testamentary transfer. All such original and additional property is referred to herein collectively as the Trust Estate, and shall be held, managed and distributed as herein provided.

III.   ADDITIONS OF COMMUNITY PROPERTY

Any community property transferred to the Trust shall remain community property and shall be so treated for all purposes after its transfer. It is our intention that we as Initial Trustees shall have no more extensive power over any community property transferred to the Trust Estate than we would have had under applicable State law had this Trust not been created, and this instrument shall be so interpreted to achieve this intention. This limitation shall terminate on the death of either Trustmaker.

Either of the Trustmakers may withdraw any property designated as community property from our Trust without revoking the Trust and such property withdrawn shall retain the community property

3

characteristics. In the event, we should revoke our Trust, any Trust property reconveyed by our Trustee shall be reconveyed as community property.

This latter provision for the transfer of community property to the Trust is central to the present dispute.

With W.D. and Floy designated Initial Trustees, Article Eleven provided for each to act as the sole Trustee upon the death of the other and further designated Katherine as the Trustee following the death of both W.D. and Floy.

In addition to its initial provision for distribution of Trust assets for W.D. and Floy's benefit, Article Ten provided that property remaining in the Trust upon the death of both would be divided in 33-1/3% shares to Carol, Caroline, and Katherine.

Following the creation of the Elliott Living Trust, W.D. and Floy moved to Alexandria, Louisiana.[2] W.D. died intestate in September 2003. By operation of the Trust, Floy became its sole Trustee.

In March 2004, while continuing to live in Alexandria, Floy hired a Louisiana attorney and executed a "Restatement" of the Elliott Living Trust, stating:

> On May 25, 1995, I established the Elliot [sic] Living Trust, wherein I reserved the right to amend the trust agreement, in whole or in part. On this day, March 25, 2004, I now exercise my power to amend that agreement, in its entirety, so that after amendment, the Elliot Living Trust states as follows:
>
> The parties to this restated agreement are Floy M. Elliot, as Trustmaker, and Floy M. Elliot, as Trustee.

Floy stated that she "transfer[ed], convey[ed] and assign[ed]" to herself as Trustee, property designated by annexed "Schedule A[,]" which broadly listed: "All property previously transferred to the Elliott Living Trust, dated May 25, 1995, as amended

---

[2] The Trust provided, in part, that "[t]he situs of the Trust Estate shall be wherever the Trustee is situated and may be transferred to such other jurisdiction within the United States as the Trustee may desire[.]"

4

and restated March 25, 2004." Floy likewise directed that her "right, title and interest in and to all of my property that may by law be held in trust and that may be assigned, be transferred to my trust." Her assignment included "without limitation, all real and personal, tangible and intangible property, located in the United States, whether separate or community, where acquired before or after the execution of this agreement . . . ."

On November 13, 2007, Floy executed a new will, indicating that she wished to "revoke all others which might have been written by her before this time." Floy listed Carol, Caroline, and Katherine as beneficiaries, in "equal shares." Floy made no reference to either the Elliott Living Trust or the 2004 Restatement thereof.

The following week, on November 18, 2007, Floy, with Carol's assistance, withdrew an account titled the "Floy M. Elliott TTEE," from a Little Rock Merrill Lynch agency and placed the totality of those funds into another Merrill Lynch account in Floy's individual name. It is those funds that are now at issue.

Floy executed a second and final will on August 23, 2008. She again revoked all prior wills and more particularly conveyed her property, upon death, to: Carol (33.34%); Caroline (33.33%); and to Katherine (33.33%). Each bequest was made "without regard as to whether said property would be considered separate or community[.]" Like the 2007 will, the 2008 testament did not include reference to the Elliott Living Trust or its Restatement.

Floy died in July 2016. In November 2017, Carol filed a "Petition for Recognition and Possession and for Independent Administration[,]" opening W.D.'s succession, the matter now under consideration. Carol explained that W.D. died intestate and described herself as his sole surviving heir due to Floy's death in 2016. She claimed that she was "entitled to the naked ownership of an undivided one-half

5

(1/2) interest in and to the community assets of the decedent's Succession, subject to any usufruct in favor of "Floy M. Elliott (or her estate)" and to "full ownership of all separate property assets" of W.D.'s succession, if any. The trial court subsequently appointed Carol as Administratrix of W.D.'s succession.

Caroline and Katherine immediately answered the petition, denied certain of its representations, and particularly asserted that:

> [T]he Decedent, William Douglas Elliott had on May 25, 1995, executed the Elliott Living Trust with W.D. Elliott and Floy M. Elliott being the trust makers (grantors) as well as the trustees. The said trust was in full force and effect at the time of the death of William Douglas Elliott and remained in full force and effect until such time as Floy M. Elliott passed away.

(Emphasis in the original.) Given the existence of the Trust, Caroline and Katherine maintained, all of the subject property "would be delineated in the Elliott Living Trust and no longer controlled by the Succession laws of [the] Louisiana Civil Code." (Emphasis in the original.)

With regard to the petition's claim regarding the community property between W.D. and Floy, Caroline and Katherine stated that "any property belonging formerly to the community … would be regulated by the provisions" of the Trust. And, thus, they claimed that Carol's rights to any properties formerly owned by W.D. and/or Floy would also fall under the Trust, which included instructions for distribution of one-third share of its assets to each Carol, Caroline, and Katherine.

Based on their beneficiary status under the Trust, Caroline and Katherine sought to intervene in the proceeding and requested an injunction restraining Carol, their mother, from taking possession of any of the assets of the Trust. The trial court granted the intervention and granted the requested preliminary injunction in

6

December 2017, prohibiting Carol "from taking possession of, transferring, disposing, alienating, or modifying the status of any assets of the Elliott Living Trust."

The trial court conducted a hearing in June 2019 at which Carol testified and both parties presented documentary evidence regarding the assets of W.D.'s estate and the status of the Elliott Living Trust.[3] The parties focused on the classification of the Merrill Lynch funds, with the original funds placed into the Floy M. Elliott TTEE account by W.B. and Floy and transferred by Floy into the Floy Elliott account in 2007, as discussed infra. While Caroline and Katherine urged that these funds always remained within the Elliott Living Trust, Carol expressed her belief to the trial court that due to Floy's concerns regarding the Trust, Floy had withdrawn them and placed them in her name individually in 2007. Floy also updated her estate documents, including the 2007 and 2008 wills wherein she revoked all prior wills and codicils. Carol argued that Floy's withdrawal of the Merrill Lynch funds and the placement of those funds in her individual account defunded and thereby revoked the Trust. She claimed that those assets then returned to the couple's community and that they must be included in W.D.'s Succession. As W.D. died intestate, Carol maintained that she is entitled to possession of his separate estate and one-half of his former community property subject to Floy's usufruct until the time of her death.

The trial court rejected Carol's position. In written reasons, the trial court detailed the creation of the Elliott Living Trust, noting W.D. and Floy's clear conveyance of all their property into the Trust. The trial court noted the lack of

_____

[3] In written reasons for ruling, the trial court framed the issues as follows:

(1)     What assets were included in W.D.'s estate at the time of his death? and

(2)     Did Floy's 2008 Will revoke the Elliott Living Trust, thereby revoking the 1995 donation of W.D. and Floy's property to the trust?

evidence regarding what that property consisted of at the time of its initial funding and the absence of "any testimony concerning additions to the trust, community, or otherwise." The only property at issue at the hearing, the Merrill Lynch Account, was held in that original account until 2007, well after W.D.'s 2003 death. The trial court remarked upon the fact that there was no evidence or testimony "offered regarding any specific assets acquired or owned by either of the Elliotts outside of the trust as either separate or community property." The trial court found that the couple's placement of property in the trust "caused the property to cease to be community property and instead become trust property controlled by the trustee." *Citing McCaffery v. Lindner*, 18-163 (La.App. 5 Cir. 12/27/18), 263 So.3d 1205, *writ denied*, 19-140 (La. 3/18/19), 267 So.3d 89.

Remarking on the Trust's broad conveyance of powers to W.D. and Floy, as Initial Trustees, the trial court observed that each "had the authority to manage, invest, transfer, exchange, open an account with a brokerage firm to act upon any instructions with respect to such accounts, etc." The trial court noted that Floy's 2004 Restatement also reflected that she, as trustmaker and trustee, retained the "absolute right to control the distribution of income and principal from the trust." Per Schedule A of the Restatement, that property included all of the property previously transferred to the Elliott Living Trust. The trial court pointed out that such an incorporation of the pre-existing Trust is provided for by La.R.S. 9:1754.[4]

---

[4] Titled "Incorporation by reference," La.R.S. 9:1754 provides:

A trust, whether inter vivos or testamentary, may incorporate by reference any or all of the terms of an existing trust. Unless the instrument otherwise provides, all amendments of the existing trust in force on the date of the execution of the instrument creating the new trust shall be deemed incorporated, but neither subsequent modification nor termination of the existing trust shall have any effect on the new trust.

The trial court found no evidence that Floy revoked or terminated the Trust. The court noted that the 2003 Revision Comment to La.R.S. 9:2051(B), which addresses the formal requirements for revocation of a trust by testament, provides that: "Subsection B allows the settlor of an inter vivos trust, who has reserved the power to modify, divide, terminate, or revoke the trust, to do so by testament. The testament must clearly identify the trust in order to have any effect on it." Floy's final 2008 will did not reference the Trust.

With no "actual proof" of termination or revocation of the Trust, the trial court's resulting analysis turned to W.D. and Floy's intent, noting that the couple had placed "all their property into a trust that they both enjoyed for many years until W.D.'s death" and that, within the Elliott Living Trust, "W.D. stated that he specifically designated Floy to continue to enjoy all the rights and benefits she had as trustee over all the property placed into the trust at the initial funding." Without proof of termination, the trial court concluded that "the Elliott Living Trust was in full force and effect" at the time of W.D.'s death. There was no evidence that W.D. held property outside of the Trust.

The trial court rejected Carol's suggestion that, upon Floy's transfer of the Merrill Lynch account into one in her own name, the property could have "reverted" to W.D.'s estate. The trial court again observed that, by the Trust, the parties divested themselves of all property and that the Trust permitted the Trustees "to manage, remove, or reinvest the property, which powers were completely within the control of Floy, as the sole trustee, until her death." The trial court found no merit in Carol's assertion that Article Four, Section III of the Trust indicated that any community property withdrawn from the Trust would be reconveyed as community property. Instead, the trial court specifically found that the section relied upon by

9

Carol, titled "Additions of Community Property," applies "to any additions that the Elliotts may have made to the trust during the existence of their community property regime." The trial court remarked that "there was no evidence of any additions" and, in fact, "[t]he only evidence admitted concerned the initial investment of all their property with no specifically stated or designated language or identifying community property."

Incorporating that finding, the trial court explained in its concluding paragraph that:

> For reasons given, the decision of the Court is that the entirety of the estate of W.D. Elliott at the time of his death was contained within the Elliott Living Trust and controlled by its trustee, Floy M. Elliott. Any properties that were contained within that trust remained in the trust with full authority for the management by the trustee, Floy M. Elliott. . . .There was a voluntary divesting of W.D. and Floy's ownership into a trust. The eventual termination of the trust upon the death of Floy and the disposal of its property according to her wishes as expressed in her Will and the Trust document would be the appropriate conclusion to the properties shared in life by W.D. and Floy.[5]

The Succession, through Carol as Administratrix, appeals, assigning the following as error:

> A.     The [trial court] erred, as a matter of law, by finding that there was no community property interest in the Trust.

---

[5] The resulting judgment reflects those findings and provides:

> IT IS ORDERED, ADJUDGED AND DECREED that the estate of William Douglas Elliott at the time of his death was controlled by the Arkansas Elliott Living Trust. Any properties that were contained within that trust remained in the trust at the time of his death.

> IT IS FURTHER ORDERED, ADJUDGED AND DECREED the Court interprets Article Four, Section III, *Additions of Community Property*, as applying to any additions that the Elliotts may have made to the trust following the initial investment. However, there was no evidence regarding any additions of community property to the trust. The initial investment was of all their property with no reservations for community property.

B.     The [trial court] erred, as a matter of law, by refusing to apply community property laws to the assets removed from the Trust.

C.     The [trial court] erred, as a matter of law, by failing to acknowledge the revocation of the trust by the Settlor.

## LAW AND DISCUSSION

*Standard of Review*

Carol maintains that the trial court's decision "in this matter was an ultimate determination of a legal conclusion that there was no community property" in the Elliott Living Trust. She suggests that the findings of facts were largely not at issue, but that the trial court was tasked with application of the facts to the underlying testamentary and trust language. Equating interpretation of the trust provisions to that of an interpretation of a testament, Carol cites *Succession of Leavines*, 15-923 (La.App. 3 Cir. 3/2/16), 215 So.3d 800, *writ denied*, 16-865 (La. 9/6/16), 205 So.3d 918, for the proposition that, when a trial court merely reviews and interprets testamentary language without the introduction of evidence, its decision is one of law, making *de novo* review on appeal appropriate. The panel in *Succession of Leavines*, 215 So.3d at 803, explained that it considered the matter under the *de novo* standard of review as "the trial court did not hold a hearing or take evidence. Rather, the trial court only reviewed and interpreted the language of the [subject] testament. When no evidence is introduced to the trial court the doctrine of manifest error does not apply[,]" the panel explained.

This case differs. The trial court conducted a hearing, heard and assessed testimony, and admitted the parties' multiple exhibits. The exhibits included not only the Elliott Living Trust and numerous wills, but a deposition, email correspondence regarding a draft revocation document, and documentation regarding the Merrill Lynch account. The trial court interpreted the testamentary

11

documents within the factual background presented by the parties. The trial judge thereafter rendered nine pages of written reasons applying those facts to the relevant documentation and legal principles. Accordingly, we review her determinations under the manifest error standard. *See In re Succession of Bernat*, 11-368 (La.App. 3 Cir. 11/2/11), 76 So.3d 1287, *writ denied*, 12-263 (La. 3/30/12), 85 So.3d 122.

*Community Property in the Trust*

Carol first asserts that the trial court determined that there was no community property interest in the Elliott Living Trust. Carol contends, instead, that a codal analysis mandates a determination that assets acquired by the couple while domiciled in Arkansas, a non-community property state, became community property assets upon their subsequent move to Louisiana. She focuses on La.Civ.Code art. 3526, which provides:

> Upon termination of the community, or dissolution by death or by divorce of the marriage of spouses either of whom is domiciled in this state, their respective rights and obligations with regard to … movables, wherever situated, that were acquired during the marriage by either spouse while domiciled in another state shall be determined as follows:
>
> (1)    Property that is classified as community property under the law of this state shall be treated as community property under that law; and
>
> (2)    Property that is not classified as community property under the law of this state shall be treated as the separate property of the acquiring spouse. However, the other spouse shall be entitled, in value only, to the same rights with regard to this property as would be granted by the law of the state in which the acquiring spouse was domiciled at the time of acquisition.

Carol's argument under Article 3526 circumvents important components of the trial court's ruling. First, it ignores the trial court's foundational determination that the Elliott Living Trust remained in effect without termination or revocation, a finding that renders Article 3526 inapplicable.

12

More specific to La.Civ.Code art. 3526, Carol's argument assumes that she proved certain facts necessary for the Article's application. She did not. Article 3526 pertains to "movables … *acquired during the marriage* by either spouse while domiciled in another state…." and further requires sufficient information to classify the property as community or separate under the laws of this state. (Emphasis added.) While Carol sought classification of the assets held by Merrill Lynch in the Floy M. Elliott TTEE account, she did not establish the origin of the funds in that account.

Recognizing the overall lack of information regarding the Elliotts' assets, the trial court observed that "[n]o evidence or testimony was offered to the Court regarding additions to the trust of either separate or community property. Nor was evidence or testimony offered regarding any specific assets acquired or owned by either of the Elliotts outside of the trust as either separate or community property." Instead, according to the trial court, "[t]he only evidence admitted concerned the initial investment of all their property with *no specifically stated or designated language reserving or identifying community property.*" (Emphasis added.) The record does not reveal evidence contrary to that finding and instead supports the trial court's further finding that "[t]here was a voluntary divesting of W.D. and Floy's ownership into a trust."

One cannot assume, as Carol's argument would suggest, that all property transferred to the Elliott Living Trust was acquired during the marriage nor that it would be classified as community property in this state as required by La.Civ.Code art. 3526. Instead, by Article Four, Section I of the Trust, the Elliotts transferred their interest to any and all property "wherever situated, held or located, whether real or personal, tangible or intangible, *separate, joint or community*[.]" (Emphasis added.) Carol did not address the funds' acquisition or their ownership classification

at the time the parties transferred those funds to the Trust. Rather, as remarked upon by the trial court, the record does not provide that information.

*Transfer of Account*

Carol next questions the determination that Floy had ownership of the funds transferred from the Floy M. Elliott TTEE account at Merrill Lynch to the account in her own name with that same agency. Carol does not dispute that the Trust granted to Floy the authority to use Trust assets for her own benefit. She instead contends that the removal of "community property" from the Trust must be viewed as having retained its community property classification under Trust Article Four, Section III and could not be viewed as having been owned by either party.

As in the first assignment of error, this argument stems from the unsubstantiated premise that the transferred funds were community property. Article Four, Section Three states:

III.   ADDITIONS OF COMMUNITY PROPERTY

Any community property transferred to the Trust shall remain community property and shall be so treated for all purposes after its transfer. It is our intention that we as Initial Trustees shall have no more extensive power over any community property transferred to the Trust Estate than we would have had under applicable State law had this Trust not been created, and this instrument shall be so interpreted to achieve this intention. This limitation shall terminate on the death of either Trustmaker.

*Either of the Trustmakers may withdraw any property designated as community property from our Trust without revoking the Trust and such property withdrawn shall retain the community property characteristics.* In the event, we should revoke our Trust, any Trust property reconveyed by our Trustee shall be reconveyed as community property.

(Emphasis added.) Again, however, Carol's argument merely assumes the funds were community property – that assumption is not substantiated by evidence.

14

In fact, the timeline of events at issue undermines the position that the couple funded the Trust with "community property." As previously discussed, it was created and the Merrill Lynch account opened while the couple lived in Arkansas, a non-community property state. The couple did not move to Louisiana until after 2001. Louisiana Civil Code Article 2338 explains, in part, that a couple's "community property" is comprised of "property acquired *during the existence of the legal regime* through the effort, skill, or industry of either spouse[.]" (Emphasis added.) The account, and its underlying funds, were thus seemingly acquired prior to the existence of the Elliotts move to Louisiana and were not community property.

Accordingly, Carol's contention that the transferred funds must be viewed as having "retained" their community classification lacks merit. As noted by the trial court, the Trust document does not identify specific community property.

*Revocation*

In her final assignment of error, Carol contends that the trial court erred in failing to find that Floy revoked the Elliott Living Trust. Citing La.R.S. 9:2041,[6] Carol maintains that the Trust was revocable, subject to revocation and/or rescission. She points to what she contends is indicative of Floy's intent to revoke the Trust,

---

[6] Titled "General rule; revocation," La.R.S. 9:2041 provides, "Except as otherwise provided in this Code, a settlor may revoke a trust in whole or in part *only if he has reserved the right to revoke the trust or an unrestricted right to modify the trust*." (Emphasis added.)

By reference, the Elliott Living Trust provides for revocation as follows:

II.    REVOCATION AND AMENDMENT OF THE TRUST

Either of us as the Trustmakers, *during our joint lives*, may at any time and upon successive occasions, revoke this Trust, in whole or in part. We may *jointly* alter or amend any of its provisions. Any Amendment may be similarly canceled or amended. The right to amend or revoke this Trust is personal to us and may not be exercised by any legal representative or agent acting on our behalf.

(Emphasis added.)

writing in her brief that: Floy sought Louisiana counsel to revoke the trust; that she transferred 100% of the assets from the trust by the transfer of the funds in the Merrill Lynch account; and that she updated her estate documents in 2007 and 2008. Carol particularly notes that, although Floy had written an earlier, 2004 will in which she incorporated the Elliott Living Trust and restated the Trust at that time, the 2007 will revoked all other wills and testaments.

The trial court rejected Carol's argument regarding revocation, noting Carol's testimony at trial, which only "made reference to an attempt by Floy to terminate her trust." Significantly, however, "no actual proof [of revocation] was produced" as observed by the trial court. We find no manifest error in that determination.

Carol further argues that La.R.S. 9:2051(B),[7] which provides for revocation by testament as follows:

> B. A modification, division, termination, or revocation of a trust may also be by testament. Such a modification, division, termination, or revocation is not effective as to a trustee until the trustee receives a copy of the testament and of the order probating it or ordering it filed and executed.

We find that Carol's position regarding revocation lacks merit. Paragraph B permits revocation by testament, but Floy's 2007 and 2008 wills reference only the revocation of prior wills and testaments. Neither references the Elliott Living Trust. Further, the 2003 Revision Comment to La.R.S. 9:2051 explains that, while

---

[7] Carol's argument addresses La.R.S. 9:2051(B), revocation by testament. For completeness, we note that La.R.S. 9:2051(A) further sets out the revocation of Trust by "authentic act or by act under private signature executed in the presence of two witnesses and duly acknowledged by the person who makes the modification, division, or termination or by the affidavit of one of the attesting witnesses." As observed by the trial court, no positive evidence of such a revocation was presented at trial. While Carol filed a motion for new trial citing the post-trial discovery of a written revocation of prior wills and testaments, the trial court denied the motion as untimely. Carol's argument is therefore not dependent on that document, referencing it by footnote in her brief. Nor does she challenge the denial of the motion for new trial.

16

"Subsection B allows the settlor of an inter vivos trust, who has reserved the power to modify, divide, terminate, or revoke the trust, to do so by testament . . . *[t]he testament must clearly identify the trust in order to have any effect on it*." (Emphasis added.)

This record lacks the documentation required by La.R.S. 9:2051(B) for revocation by testament. In fact, the last testamentary statement regarding the Elliott Living Trust occurred in 2004 when Floy executed both a will making positive reference to the Elliott Living Trust[8] and a "Restatement" thereof.

Furthermore, despite Carol's argument regarding revocation, it is again clear that the evidence presented in this case did not establish the classification of the funds at issue as community or the separate property of W.D. and/or Floy. As remarked upon by the trial court, "[t]he only evidence admitted concerned the initial investment of all their property with no specifically stated or designated language reserving or identifying community property."

Given that lack of evidence, we maintain the trial court's judgment "that the estate of William Douglas Elliott at the time of his death was controlled by the Arkansas Elliott Living Trust. Any properties that were contained within that trust remained in the trust at the time of his death." To the extent Carol relies on Floy's subsequent actions regarding revocation, the record before the court does not support

---

[8] The 2004 will accounted for the Elliott Living Trust as follows:

**Section 2.01   Pour-Over to My Living Trust**

All of my probate estate, excluding any property over which I might have a power of appointment, and after payment of expenses and taxes which are paid pursuant to this will, I give to the Trustee of the Elliott Living Trust dated May 25, 1995 as restated on April 13, 2004 and executed prior to this will, to be added to the property of that trust and direct that the Trustee administer the property as provided in the trust agreement and any amendments prior to my death.

17

her position.  We agree with the learned trial judge and affirm her well-reasoned decision.

## DECREE

For the foregoing reasons, the judgment of the trial court is affirmed.  Costs are assigned to the Appellant, Carol Ann Elliott Feldkamp, individually and in her capacity as Independent Executrix of the Succession of William Douglas Elliott.

**AFFIRMED.**

THIS OPINION IS NOT DESIGNATED FOR PUBLICATION.
Uniform Rules—Courts of Appeal, Rule 2-16.3